**Paul MOOD, Individually and D/B/A K & M Distributors, Appellant,**

v.

**KRONOS PRODUCTS, INC., Appellee.**

No. 05-06-00111-CV.

Court of Appeals of Texas, Dallas.

Nov. 28, 2007.

Mark L. Nastri, LaDawn Conway, Munsch, Hardt Kopf & Harr, P.C., Holly M. Church, Dallas, for appellant.

Thomas M. Michel, Griffith, Jay, Michel & Moore, L.L.P., Fort Worth, Earl S. Nesbitt, Nesbit & Vassar, L.L.P., Addison, for appellee.

Before Justices MORRIS, FRANCIS, and MAZZANT.

## OPINION

Opinion by Justice MORRIS.

This case arises out of the breach and termination of a distributorship agreement for Greek foods between Kronos Products, Inc. and Paul Mood, individually and d/b/a K & M Distributors. After disregarding a portion of the jury verdict, the trial court rendered judgment awarding Kronos $211,342.70, plus attorney's fees. The trial court also rendered a take-nothing judgment on Mood's counterclaim for breach of the agreement. Mood filed this appeal contending the trial court erred in disregarding the jury's answers to three questions. Kronos filed a cross-appeal asserting the trial court erred in failing to disregard the jury's answer to another question. For the reasons that follow, we affirm the trial court's judgment.

## I.

In 1992, Kronos and Mood executed an agreement establishing Mood as an exclusive distributor of Central Gyros Company products within a 50–mile radius of Dallas, Austin, and Oklahoma City. Included in the agreement was a sixty-day notice of termination provision. In July 2003, Kronos informed Mood that it was going to sell Central Gyros Company products directly to one of Mood's customers, Dan's Food Service, in direct violation of the distributorship agreement. Concerned about his future with Kronos, Mood contacted another supplier and purchased products from it in October 2003. Mood also continued to order from Kronos.

On November 18, 2003, Mood placed an order with Kronos. One or two days later, the parties had a telephone conversation. According to Mood, Kronos informed him at that time it was terminating their relationship and would not be shipping his November 18 order. Kronos contends, however, that it refused to ship any more product to Mood after he refused to pay his past due account balance. It also asserts that, according to the agreement, Mood's purchase of similar products from a competing supplier entitled it to immediately terminate the distributorship without the need for sixty days' notice.

Kronos filed this suit to recover the balance due on Mood's account. Mood counterclaimed for breach of the distributorship agreement. At trial, Kronos stipulated that selling Central Gyros brand products directly to Dan's was a breach of the distributorship agreement. Likewise, Mood stipulated that his failure to pay Kronos's invoices was a breach of the parties' distributorship agreement. By answers to the trial court's questions to them, the jury in question 1 awarded Kronos $188,292.55 in damages for Mood's failure to pay its invoices, awarded Kronos in question 2 attorney's fees up to and including an appeal to the Texas Supreme Court, awarded Mood in question 3 damages in the amount of $30,000 for Kronos's sale of Central Gyros brand products directly to Dan's, found in question 4 that Kronos

failed to comply with the sixty-day notice provision for terminating the agreement, awarded Mood in question 5 damages in the amount of $550,000 for Kronos's failure to comply with the notice provision, and awarded Mood in question 6 attorney's fees up to and including an appeal to the Texas Supreme Court.

The trial court rendered judgment in favor of Kronos based on the jury's answers to questions 1 and 2. In response to Kronos's post-verdict motion, however, the trial court disregarded the jury's verdict on questions 3, 5, and 6 and rendered a take-nothing judgment on Mood's counterclaim. This appeal followed.

## II.

■ In his first four issues, Mood asserts the trial court erred in disregarding the jury's answers to questions 3, 5, and 6. A trial court may disregard a jury finding that has no support in the evidence. *See* Tex.R. Civ. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003). In determining whether there is no evidence to support the jury verdict, we examine the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could have done so and disregarding contrary evidence unless reasonable jurors could not have done so. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005).

■ In response to question 3, the jury awarded Mood $30,000 in lost profits for Kronos's actions in selling Central Gyros brand products to Dan's, a breach of the distributorship agreement to which Kronos stipulated at the beginning of trial. Mood does not dispute that there was no expert testimony or other evidence that provided a definite lost profit figure or a specific calculation for this breach. Rather, Mood contends the following evidence enabled the jury to derive its own calculation for

lost profits and arrive at the $30,000 figure: (1) invoices dated August 2003 through March 2005 from Kronos to Dan's, (2) evidence that Mood averaged about $255,762 per year in gross sales to Dan's, (3) Mood's general assertion that he usually operated on a gross profit margin of twenty percent, and (4) Mood's expert witness's acknowledgment that Mood told him eighty percent of his sales were from Central Gyros brand products.

The invoices from Kronos to Dan's do not support the jury figure as there was no evidence that Mood and Kronos were selling the same Central Gyros brand items to Dan's at the same volume or at the same pricing scale. In any event, Kronos's gross sales to Dan's, as reflected in the invoices, are no evidence of Mood's lost profits from Kronos's admitted breach. Mood's reliance on the $255,762 annual sales figure to Dan's is similarly misplaced. Kronos's counsel mentioned this figure during his cross-examination of Mood's damages expert Harrison Payne. Apparently, counsel's staff derived the figure from Mood's invoices to Dan's that Mood provided to Kronos. Payne acknowledged he had not reviewed these invoices. Counsel simply asked Payne to assume the $255,762 figure was correct for a hypothetical question that followed. Thus, this figure was no evidence to support the jury's lost profit award in question 3.

Finally, Mood's general statement that the company operated on a twenty percent gross margin from 1990 through 2004 and evidence that eighty percent of his overall sales came from Central Gyros brand products do not support the jury award because there was no evidence that Mood's sales to Dan's were similar to his overall sales percentages for Central brand products or that his gross margin on Central brand products to Dan's, or anyone one else, was twenty percent. Thus, there was

no evidence from which the jury could calculate Mood's lost profits as a result of Kronos's sale of Central brand products to Dan's. *See Holt Atherton Indus. v. Heine,* 835 S.W.2d 80, 85 (Tex.1992). Because there is no evidence to support the jury's $30,000 award, the trial court did not err in disregarding the jury's answer to question number 3.

■ Mood also challenges the trial court's ruling disregarding the jury's $550,000 award in question 5 for Kronos's failure to comply with the distributorship agreement's sixty-day notice provision. Question 5 instructed the jury to consider as the only element of damages lost profits that were the natural, probable, and foreseeable consequence of Kronos's failure to give notice.

■ Generally, the measure of damages for breach of contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed. *SAVA gumarska v. Advanced Polymer Sciences, Inc.,* 128 S.W.3d 304, 317 n. 6 (Tex.App.-Dallas 2004, no pet.). This measure may include reasonably certain lost profits. *See Cmty. Dev. Serv., Inc. v. Replacement Parts Mfg., Inc.,* 679 S.W.2d 721, 725 (Tex.App.-Houston [1st Dist.] 1984, no writ.) Lost profits are damages for the loss of net income to a business. *Miga v. Jensen,* 96 S.W.3d 207, 213 (Tex.2002). Lost profits may be in the form of direct damages, that is, profits lost on the contract itself, or in the form of consequential damages, such as profits lost on other contracts or relationships resulting from the breach. *See Continental Holdings, Ltd. v. Leahy,* 132 S.W.3d 471, 475 (Tex.App.-Eastland 2003, no pet.). But regardless of whether the lost profits are characterized as direct or consequential damages, the amount of the loss must be shown by competent evidence with reasonable certainty, be based on objective facts, figures, or data, and be predicated on one complete calculation. *See Holt,* 835 S.W.2d at 84. The injured party must do more than show that they suffered some lost profits. *See Szczepanik v. First Southern Trust Co.,* 883 S.W.2d 648, 649 (Tex.1994). Finally, consequential damages may not be recovered unless they are foreseeable and traceable to the wrongful act and result from it. *See Stuart v. Bayless,* 964 S.W.2d 920, 921 (Tex.1998).

Payne, the damages expert, provided the only testimony on the lost profits Mood sustained as a result of Kronos's failure to provide the sixty-day notice. Payne indicated that Mood asked him to prepare an economic damages model assuming the wrongful termination of the distributorship agreement. Using financial data from previous tax returns, Payne created a damage model using Mood's overall profits and growth rate from 1994 through 2002 to predict the amount of profits Mood lost for the next ten years as a result of Kronos's termination of the distributorship without the sixty-day notice. Specifically, Payne relied on Mood's 2002 pre-tax net income at a six percent profit margin for a starting point and applied a three percent annual growth rate to project Mood's expected profits from 2004 through 2013 had the breach not occurred. To predict profits through 2013 with the breach, Payne used a "discrete revenue forecast" provided by Mood through 2010 with an annual growth rate of 3 percent through 2013. Payne then applied a seventeen percent discount rate to the annual figures. He noted the discount rate reflected a number of unknowns and variables, including how many customers would have migrated with Mood had he been given the sixty-day notice and the fact that not all of Mood's sales were subject to the distributorship agreement. After subtracting the predicted non-breach

pre-tax income from the forecasted post-breach pre-tax income, Payne opined that but for Kronos's wrongful termination without notice, Mood would have earned about $1.1 million in profits from January 1, 2004 continuing through 2014.

In the trial court and on appeal, Kronos asserts the jury's $550,000 award must be disregarded because Mood's lost profits were limited, as a matter of law, to sixty days in accordance with the notice of termination provision. The company additionally argues that Payne's testimony was speculative and not based on objective data. Finally, Kronos contends that because the only evidence of lost profits was a projected ten-year calculation beginning in 2004, there was no evidence to support an appropriate damage calculation that would have been the amount of profits Mood lost during the sixty days immediately following Kronos's termination of the agreement.

Mood concedes his direct damages for breach of the notice provision are limited to profits he lost as Kronos's sole distributor in the exclusive territory for the sixty-day notice period. He argues, however, that his recovery of consequential damages in the form of lost profits is not so limited. We agree with Mood that the termination notice period itself does not necessarily set the limits of damages in this type of case. For instance, a termination in violation of a notice provision could have a severe impact on the continuation of a well-established business and might include the loss of customer goodwill or damaged customer relationships. The damage evidence here, however, does not support consequential damages in the form of lost profits as awarded by the jury.

Payne's future lost profits calculation was based on historical financial data and sales figures from the period when the distributorship agreement was in place. It did not differentiate between profits lost as Kronos's sole distributor in the exclusive territory during the sixty-day notice period (direct damages) and those lost from other contracts or damaged business relationships (consequential damages). Instead, Payne's lost profit analysis simply predicted what profits would have been for the next ten years based on what sales had been while the distribution contract was in effect and then subtracted from that figure the amount of profits Mood anticipated after the breach. Payne reduced the figures to present day value using a conservative discount rate of seventeen percent. As such, his lost profits analysis necessarily included lost sales resulting from the termination of the underlying distribution agreement and was not limited to the lost profits resulting from the inadequate notice. Put another way, his analysis did not specifically address the economic impact of the summary termination of the distributorship agreement. Payne assumed that Mood's profits would have continued as they had been, even after the distribution agreement was terminated, so long as Mood had the requisite sixty-day notice. This assumption, however, is nothing more than speculation with no support in the evidence. He made no computations with respect to consequential damages incurred at the time of breach, such as loss in value of the business as a going concern due to customer goodwill. Because Payne's lost profit analysis was based on figures that assumed ten years of profits given the continuance of the distributorship agreement, his damage model is no evidence of either direct or consequential lost profits that Mood suffered as a result of Kronos's violation of the sixty-day notice provision. Accordingly, the trial court did not err in disregarding the jury's lost profit award.

▮ In his fourth issue, Mood asserts the trial court erred in disregarding the

jury's answer to question 6, which awarded Mood attorney's fees. Mood sought attorney's fees pursuant to chapter 38 of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. § 38.001 et seq. (Vernon 1997). Because Mood was not a prevailing party on any of his claims, he was not entitled to recover attorney's fees. *See Green Int'l, Inc. v. Solis,* 951 S.W.2d 384, 390 (Tex.1997). We resolve Mood's fourth issue against him.

Our conclusion that Mood's damage evidence was legally insufficient to support an award for Kronos's breach of the termination notice provision makes it unnecessary to address Mood's fifth issue and Kronos's conditional cross-issue, which address the propriety of the trial court's failure to disregard the jury finding that Kronos breached the contract by failing to provide the required sixty-day notice prior to termination.

We affirm the trial court's judgment.