# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-08-00549-CV

**Michael P. Barry, Appellant**

**v.**

**Donald Jackson and Karen Jackson, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. D-1-GN-03-000710, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

## CONCURRING AND DISSENTING OPINION

The concurring and dissenting opinion dated January 15, 2010, is withdrawn, and this opinion is substituted in its place.

Reversing in part the district court's award of damages against appellant Michael P. Barry for breach of a residential real estate contract following a bench trial, the majority misapplies the law upon which it relies, *see Kempner v. Heidenheimer*, 65 Tex. 587, 591 (1886), as well as our standard of review by substituting itself as the fact finder. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). Because I would overrule Barry's points of error and affirm the judgment of the district court, I concur in the majority's opinion to the extent it affirms the district court's award of damages but dissent to the remainder of the majority's opinion.

I begin by reviewing the background of the parties' dispute and then discuss each of Barry's points on appeal.

## BACKGROUND

In July 2002, Barry, through his real estate agent Lisa Kennedy, approached the Jacksons about purchasing their residence located at 10713 Redmond in Austin, Texas. At the time, the Jacksons' residence was not on the market. After Barry was shown the residence, the parties negotiated and agreed to a purchase price of $370,000. On July 13, 2002, the parties entered into a contract in which Barry agreed to purchase the Jacksons' property for the agreed purchase price (the "residential contract"). The residential contract required (i) Barry to deposit $3,000 in earnest money; (ii) the Jacksons to provide a seller disclosure notice to Barry, but not to make any repairs to the residence prior to closing; and (iii) a closing date of August 12, 2002. Barry also had the right to have the Jacksons' residence inspected and to terminate the contract "for any reason within 7 days" after Barry received the Jacksons' disclosure notice.

After entering into the contract with Barry and with Kennedy's assistance, the Jacksons began searching for a residence to purchase. On July 17, 2002, the Jacksons entered into a contract to purchase a residence located on Pebble Garden Court (the "Pebble Garden contract"), depositing $3,000 earnest money and paying an option fee of $500 "for the unrestricted right to terminate this contract by giving notice of termination to Seller within 7 days after the effective date of this contract." The Pebble Garden contract also provided a closing date of August 12, 2002.

Pursuant to the terms of the residential contract, Barry deposited earnest money of $3,000 with the title company, the Jacksons provided a seller disclosure notice dated July 15, 2002,

2

and the Jacksons' residence and the Pebble Garden residence were inspected by the same company on July 23, 2002. The inspection report for the Jacksons' residence included repair items not included on the seller disclosure notice. On or about July 25, 2002, Barry notified the Jacksons that he was not going to purchase their residence.[1] It was undisputed that he was financially able but decided against the purchase. The Jacksons thereafter cancelled the Pebble Garden contract, losing their earnest money deposit and option fee. On August 6, 2002, Barry entered into a contract to purchase a different residence in the same neighborhood for $415,000 and closed on the other residence on August 26, 2002.

After Barry failed to purchase their residence, the Jacksons put their residence on the market at the list price of $370,000 until November of 2002. In November, they discovered a leak that required repair and took their residence off the market to have the leak repaired. Their final payment on the repairs was in March 2003. They then put their residence back on the market at the end of May 2003, listed the residence with Keller Williams in July 2003, and sold it in September 2003 for $339,000. Pursuant to the terms of the subsequent contract to sell their residence (the "subsequent contract"), the Jacksons incurred costs that they would not have incurred had Barry purchased their residence, including additional closing costs of $9,000 and repair costs to their residence. They also agreed to convey certain items as part of the sale, such as their refrigerator, that they were not required to convey to Barry pursuant to the residential contract.

---

[1] The date that Barry notified the Jacksons that he was not going to purchase their residence and his reasons for doing so were disputed at trial. Barry testified that he notified the Jacksons on July 23, 2002, that he was not going to buy their house. Even according to Barry's testimony, then, Barry did not notify the Jacksons of his intent to terminate within the seven-day termination period that began to run on July 15.

3

The Jacksons filed suit against Barry in May 2003, seeking damages for breach of the residential contract.[2]  The Jacksons obtained a summary judgment in 2004 and were awarded damages plus the release of the earnest money of $3,000 that Barry had deposited with the title company.[3]  Based on the district court's order, the title company released the earnest money to the Jacksons.  Barry thereafter filed a motion for new trial, asserting that he did not receive notice of the summary judgment hearing.  The district court granted Barry's motion, and the Jacksons deposited the earnest money that they had received from the title company into the registry of the court.

The case was tried to the court in May 2008.  Barry's defenses included material misrepresentation, failure to disclose, and election of remedies.  Barry testified concerning his communications and negotiations with the Jacksons, his reasons for not closing the transaction to purchase the Jacksons' residence, and his purchase of a different residence in the same neighborhood.  He testified that he planned to purchase the Jacksons' residence until he discovered that the Jacksons had misrepresented and failed to disclose material defects in the residence's condition and the nature, safety, and distance of the walk to the elementary school.

The Jacksons both testified as to their communications and negotiations with Barry.  They testified that they did not misrepresent to Barry the nature of the walk to the elementary school or have prior knowledge of the repair items identified in the inspection report.  They also testified

---

[2]  The Jacksons initially brought suit in March 2003 against the real estate broker Lisa Kennedy and Coldwell Banker-Richard Smith Realtors.  They added Barry as a defendant in May 2003.  At the time of trial, the Jacksons had dismissed the other defendants after reaching a settlement with them.

[3]  The district court awarded the sum of $62,557, plus damages for failing to attend a mediation in the amount of $1,500, attorney's fees in the amount of $3,775, all costs of court, and the release to the Jacksons of the $3,000 earnest money deposited with the title company.

concerning a meeting that occurred between the Jacksons, Barry, and Kennedy on July 23, the day of the inspections.

At the meeting, Mr. Jackson testified that Barry told them that he thought the agreed price was too expensive and that the Jacksons advised Barry that they needed to know by the following day because of the option they had on the Pebble Garden contract:

Q.   When was the first idea that you had that [Mr. Barry] might not close on [your house]?

A.   July 23.

Q.   What occurred on July 23?

A.   July 23 was the day of the two inspections. . . .

Q.   At some point did Mr. Barry show up at your house?

A.   About 4:30 that afternoon. . . . We sat down at the dinner table once again. Mr. Barry, myself, Karen, my wife, Lisa Kennedy, realtor, and sort of briefly went through the inspection. Mr. Barry indicated at that time he couldn't buy our house because he found out how much we paid for it when we purchased it previously four, five years ago. He also mentioned that he had five kids to feed, he lost 40% of his investments in the stock market prior to July 1st, '01 and he may not be moving—be taking relocation here to Austin.

Q.   Did [Mr. Barry] indicate to you that your house was too expensive?

A.   He did say it was too expensive. He said—found out what we had paid initially when we first bought it and that we were making too much profit.

Q.   Okay. How did that conversation end?

A.   We told Mr. Barry at that point we had an option on the Pebble Garden home and we need to know the following day. He said he had to go back and talk to his wife. He would get back in touch with Lisa Kennedy and let her know his plans to either purchase the home or not . . . .

5

Mr. Jackson testified that he did not hear anything further until after the option period had expired on the Pebble Garden contract. Mrs. Jackson also testified concerning the reasons that Barry told them that he was considering not purchasing the Jacksons' residence:

> Q. Okay. Now on July 23 the conversation around the kitchen table, did Mr. Barry indicate to you at that time that he was not going to buy your house?
>
> A. He said he was considering not buying it, I think were his words.
>
> Q. What were the reasons that he gave you for considering not buying your house?
>
> A. That—first of all, he found out that we were going to make too much money off of it because he knew what we paid for it originally and that he had five kids to feed and that he lost money—part of his investments. I want to say it was 40 percent of his investments and that he might not move to Austin.

Mr. Jackson also testified concerning their negotiations and communications surrounding the Pebble Garden contract, their efforts to sell their residence from August 2002 to September 2003,[4] and their losses incurred from Barry's failure to purchase their residence.

---

[4] Mr. Jackson testified concerning their reasons for taking the residence off the market in the middle of November 2002 and putting it back on the market at the end of May 2003:

> Q. During that period of time did you have the house on the market?
>
> A. No, we took the residence off the market due to the repairs.
>
> Q. After the repairs were complete did you put the house back on the market?
>
> A. We put the house back on the market Memorial Day weekend of '03, as we wanted to finish out the school year before we started looking for homes. And the market was generally fairly slow up until late spring, early summer. So we didn't put the house back on the market until about the end of school, which would be the last week or so of May.

6

Robert Mohr, the real estate agent who listed and sold the Jacksons' residence in September 2003, testified as an expert and fact witness for the Jacksons. Mohr testified to his efforts to market and sell the residence and opined concerning the residence's market value.

Following the trial, the district court granted judgment in favor of the Jacksons, awarding damages for breach of contract in the amount of $46,965, out-of-pocket damages of $3,889, and attorney's fees of $23,165. The district court also entered findings of fact and conclusions of law. Barry moved for a new trial and requested additional findings of fact and conclusions of law. The district court did not make additional findings or conclusions, and Barry's motion for new trial was overruled by operation of law.

**ANALYSIS**

In three points of error, Barry does not challenge the district court's conclusion of law that he breached the residential contract.[5] Barry challenges the damages that the district court awarded to the Jacksons. In his first point of error, Barry contends that there was no evidence or insufficient evidence to support the award of any damages other than the earnest money of $3,000 because the Jacksons requested and received the earnest money in 2004. In his second and third points of error, Barry contends that there was no evidence or insufficient evidence to support the award of actual damages, out-of-pocket damages, nominal damages, or attorney's fees. As part of his second point of error, Barry also complains that the district court erred in overruling his

---

[5] The district court's conclusions of law included that Barry breached the residential contract to purchase the Jacksons' property and that the Jacksons' right to collect damages from Barry was not barred by fraudulent inducement or material misrepresentations.

7

objection to the admission of expert testimony by Mohr on market value. Because I would affirm the judgment of the district court, I address each of Barry's points of error. *See* Tex. R. App. P. 47.1.[6]

### *Election of Remedies*

In his first point of error, Barry contends that there was no evidence or insufficient evidence to support the award of any damages other than the earnest money of $3,000 because the Jacksons elected the "alternative, non-mutual contractual" remedy to terminate the residential contract when they requested and received the earnest money in 2004. Barry contends that the receipt of the earnest money precluded the Jacksons from recovering any other damages under the remedies clause of the residential contract. The remedies clause provided that, in the event of Barry's breach, the Jacksons

> may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract.

Barry relies on the affirmative defense of election of remedies. The election doctrine may bar relief when one successfully exercises an informed choice between two or more inconsistent remedies, rights, or state of facts as to constitute manifest injustice. *See Martin v. Herrera*,

---

[6] In response to Barry's points of error, I review the evidence for legal and factual sufficiency to support the district court's findings of fact concerning damages. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (legal sufficiency standard of review); *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (trial court's findings of fact are reviewed for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (when considering factual sufficiency challenge, reviewing court considers all of the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust").

927 S.W.2d 597, 600 (Tex. 1996) ("[A]n election will bar recovery when the inconsistency in the assertion of a remedy, right, or state of facts is so unconscionable, dishonest, contrary to fair dealing, or so stultifies the legal process or trifles with justice or the courts as to be manifestly unjust." (quoting *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex. 1980))); *see also Aguiar v. Segal*, 167 S.W.3d 443, 455-56 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (court held that sellers entitled to earnest money as liquidated damages under remedies clause in real estate contract based on buyers' breach and sellers' election to terminate).

Although the express terms of the remedies clause allowed the Jacksons to elect to terminate the residential contract in the event of Barry's breach and receive the earnest money as liquidated damages, the Jacksons' pleadings and evidence at trial demonstrated that they did not elect to terminate the contract and limit their damages to the earnest money, but to seek "such other relief as may be provided by law." Mr. Jackson testified at trial that, when Lisa Kennedy requested the Jacksons to sign a "release of earnest money" in July 2002, they refused to do so.[7] Consistent with their refusal to sign the release, the Jacksons brought suit against Barry in 2003, seeking monetary damages based on his breach of the residential contract.

Further, the record shows that the Jacksons received the earnest money from the title company during the pendency of this suit based upon the district court's order that granted their motion for summary judgment and awarded them monetary damages against Barry. After the

---

[7] The form "Release of Earnest Money" that was sent to the Jacksons for signature in July 2002 was admitted as an exhibit. The form reflects that Barry signed it on July 28, 2002, and Kennedy signed it on July 27, 2002. The form "provides for the release of the parties, brokers, and title companies from all liability under the contract (not just for disbursement of earnest money)." Neither Mr. or Mrs. Jackson signed the form.

district court granted Barry's motion for new trial and set aside the summary judgment order, the Jacksons deposited the earnest money that was released to them from the title company into the registry of the court. The Jacksons' temporary receipt of the earnest money stemming from the district court's order is not inconsistent with their election to seek monetary damages under the contractual remedies clause and does not support limiting their recovery to the earnest money based on the election of remedies defense. *See Martin*, 927 S.W.2d at 600.

I would conclude that the evidence was legally and factually sufficient to support a finding that the amount of monetary damages from the breach was not limited to the amount of earnest money. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (legal sufficiency standard of review); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (factual sufficiency standard of review); *see also Martin v. Birenbaum*, 193 S.W.3d 677, 683-84 (Tex. App.—Dallas 2006, pet. denied) (although seller acted to prevent return of earnest money to buyer after buyer breached contract to purchase seller's residence, evidence sufficient that intended to sue rather than accept liquidated damages; evidence did not conclusively establish buyer's election defense).

I therefore concur with the majority's decision to overrule Barry's complaints related to the Jacksons' purported election of remedies.

### *Sufficiency of Evidence of Damages*

In his second point of error, Barry challenges the sufficiency of the evidence to support the district court's awards of actual damages and out-of-pocket damages. As part of his second point of error, he also challenges the admission of Mohr's expert testimony on market value. In his third point of error, Barry challenges the sufficiency of the evidence to support the award of

10

attorney's fees. I begin by addressing the admission of Mohr's expert testimony and then address each of the challenged awards.

1.  *Expert Testimony of Market Value*

Barry contends that the district court erred in allowing Mohr to testify as an expert concerning the market value of the Jacksons' residence. Barry urges that the Jacksons' responses to Barry's request for disclosure and interrogatories were inadequate because they only disclosed that Mohr would testify to market value and did not provide "the general substance" of Mohr's "mental impressions and opinions and a brief summary of the basis for them." *See* Tex. R. Civ. P. 194.2(f)(3).

Challenges to the admission of expert witness testimony are reviewed under an abuse of discretion standard. *Larson v. Downing*, 197 S.W.3d 303, 304-05 (Tex. 2006); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

The Jacksons' responses to Barry's discovery requests are not in the record, and it was Barry's burden "to see that a sufficient record [was] presented to show error requiring reversal." *See Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex. 1990). Further, during the exchange with the district court concerning Barry's objection, counsel for Barry represented that the Jacksons designated Mohr as an expert in 2005 and disclosed that he would testify on "market value" and that Barry had not objected to the adequacy of Jacksons' discovery responses prior to the bench trial or attempted at any time to depose Mohr. Barry's counsel also agreed with the district court that "all"

11

the Jacksons did not disclose was "his actual opinion as to the market value." The district court explained its ruling to admit Mohr's testimony on market value:

> Well, if you had no indication that he was going to testify as to the subject matter then certainly you would be surprised now. But since 2005 it was clear that he was designated as an expert on the market and market value of the property. And it seems to me sort of unfair at this point to say, but he didn't put in the actual number that he was going to testify to. So I'll allow him to testify.

On this record, I would conclude the district court did not abuse its discretion when it allowed Mohr to testify concerning the market value of the Jacksons' residence. *See Larson*, 197 S.W.3d at 304-05; *Downer*, 701 S.W.2d at 241-42; *see also* Tex. R. Civ. P. 193.6(a)(2) (evidence not properly disclosed may be admitted if the court finds other party will not be unfairly surprised).

### 2. *Actual Damages*

Barry contends the Jacksons failed to carry their burden of proving any damages based on breach of contract because evidence of the market value of the Jacksons' residence at the time of the breach was necessary to support an award of actual damages and the Jacksons failed to produce any such evidence. As to the subsequent sale of the Jacksons' residence in 2003, Barry argues that he is not bound by the subsequent sale price as a component of the measure of damages because the Jacksons failed to notify him of the pending sale and there was no evidence that the resale was within a reasonable time after the breach and, in any event, the applicable measure of damages does not include recovery for the extra costs that the Jacksons incurred in the subsequent sale. Reversing the district court's award of $46,965 for breach of contract damages, the majority agrees with Barry that evidence of the residence's market value at the time of the breach was

12

essential to recover damages, there was no such evidence, and the Jacksons were not entitled to recover their extra costs from the delay and subsequent sale.

The district court made the following findings of fact and conclusions of law concerning Barry's breach of the residential contract and actual damages from the breach:

## FINDINGS OF FACT

2) On or about July 13, 2002, Defendant Michael Barry entered into a Residential Contract to purchase the Jackson property on Redmond for $370,000.00.

3) The contract by Defendant Barry to purchase the Plaintiffs Jacksons' property provided for a closing date of August 12, 2002.

4) Defendant Barry failed to close and purchase the Plaintiffs Jacksons' property pursuant to the contract by August 12, 2002.

5) Defendant Barry, prior to August 12, 2002, entered into a contract to purchase other property located at 5705 Ballentine Court, Austin, Texas, upon which Barry closed.

\* \* \*

9) After Defendant Barry failed to purchase the Plaintiffs Jacksons' property, they placed the property on the market for sale and sold the property for $339,000.00, with contractual terms requiring Plaintiffs Jacksons to pay $15,965 more than the Barry contract.

## CONCLUSIONS OF LAW

1) Defendant Barry breached the Residential Contract to purchase the Plaintiffs Jacksons' property.

2) The damages incurred by the Plaintiffs Jacksons for the breach of the contract include actual damages of $46,965.00.

13

The findings of fact support the district court's conclusion of law that "damages incurred by the Plaintiffs Jacksons for the breach of the contract include actual damages of $46,965." The amount of $46,965 equals $31,000—the difference between the sale's prices of the residential contract and the subsequent contract—plus $15,965, the extra costs that the district court found the Jacksons incurred pursuant to the terms of the subsequent contract.

"Generally, the measure of damages for breach of contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed." *Mood v. Kronos Prods., Inc.*, 245 S.W.3d 8, 12 (Tex. App.—Dallas 2007, pet. denied). The majority relies upon the measure of damages for the breach of a real estate contract set forth by the supreme court in *Kempner*—the difference between the contract price and the market value at the time of the breach. *See* 65 Tex. at 591; *see also Kollmeyer v. Stewart*, No. 05-00-01787-CV, 2001 Tex. App. LEXIS 8194, *10-11 (Tex. App.—Dallas Dec. 21, 2001, no pet.) (mem. op., not designated for publication) (citing *Kempner* measure of damages in context of breach of real estate contract). But, when the purchaser breaches the real estate contract, the market value "may be fixed by a fair resale, after notice to the party, to be bound by the price as the value, within a reasonable time after the breach." *Kempner*, 65 Tex. at 591.[8] The resale price thus fixes the value for determining the seller's damages, and additional evidence of market value at the time of the breach is not necessary. *See id*. This alternative measure of damages comports with the "'universal rule

---

[8] Without distinction, the majority cites cases addressing a purchaser's measure of damages when a seller breaches a real estate contract and cases addressing a seller's measure of damages when the seller did not resell its property. I would conclude that the measures of damages in those situations are not comparable to the situation here—a purchaser's breach followed by a resale.

14

for measuring damages'" of "'just compensation for the loss or damage actually sustained.'" *See*

*Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (quoting *Stewart v. Basey*, 245 S.W.2d 484,

485-86 (Tex. 1952)); *see also Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817

(Tex. 1997) (types of damages defined and compared).

The supreme court in *Kempner* explained the requirements of "reasonable time" and

notice to bind a defaulting purchaser to the resale price:

> What is a reasonable time is a question of fact, varied by the circumstances of each
> case. The lapse of such period as would give room for fluctuations in the market in
> the usual order of things, or of such as would authorize the inference that the vendor
> had elected not to adopt this means of fixing the measure of liability, would be
> unreasonable. . . . To be bound by the price, the defendant should have notice of the
> sale. The sale is, in some sense, a sale of his property to pay his debt, and, to protect
> his interest, he is entitled to notice.

65 Tex. at 591 (internal citation omitted).

On the facts before it, the supreme court concluded that a private resale that occurred

seven months after the breach "without advertisement or the use of any professional agency" was

not binding on the defendant because "the property was not fairly upon the market." *Id*. The

supreme court did not reach the issue of whether the resale was "within a reasonable amount of

time." *Id*. Further, although the supreme court did not bind the defendant to the resale price in

*Kempner*, the resale price remained evidence of the market value "to be considered by the trial court

in connection with the other evidence bearing upon the point." *Id*. In other words, the resale price

remained evidence for the fact finder to consider in determining damages. Applying the *Kempner*

measure of damages here, the price of the Jacksons' subsequent sale "fixed" the market value if the

sale was within a reasonable time and with sufficient notice to Barry and, in any event, the price was evidence the fact finder could consider. *See id.*

In reversing the district court's award of breach of contract damages, the majority disregards entirely the evidence favorable to the award of damages, including the Jacksons' efforts to sell their residence after the breach and the subsequent sale price and makes its own fact finding that the subsequent sale was not "within a reasonable time after the breach." *See id.*; *see also City of Keller*, 822 S.W.3d at 822 (appellate court "must consider evidence in light most favorable to the verdict, and indulge every reasonable inference that would support it"). Weighing the evidence, the majority finds persuasive the fact that the Jacksons listed the property for sale by owner after Barry's breach for a period of time and then took the property off the market for another period of time. The majority also finds that there is no evidence of the condition of the real estate market between the time of the breach and the subsequent resale. The majority focuses on the supreme court's reference in *Kempner* to "fluctuations in the market" in its discussion of what is a "reasonable time." The majority exceeds its role as an appellate court.

The determination of what is reasonable falls squarely within the province of the fact finder—"what is a reasonable time is a question of fact, varied by the circumstances of each case." *See Kempner*, 65 Tex. at 591; *see also Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (trial court's findings of fact are reviewed for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict); *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991) (same). Further, in the context of the supreme court's analysis of "the circumstances" of that case, the reference to "reasonable time" and "market fluctuations" was to the seller's *efforts* to make a fair

resale, not the market's actual condition at the time. *See* 65 Tex. at 591 (court discusses plaintiff's efforts to sell property after breach and not the actual market conditions during the period between breach and resale); *cf. Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1*, 908 S.W.2d 415, 426 (Tex. 1995) (injured party, following a breach, must exercise reasonable care to minimize his damages if it can be done with slight expense and reasonable effort).[9]

Evidence of the "circumstances" here included Barry's statement to the Jacksons days before breaching the contract that the agreed price of $370,000 was "too expensive," the Jacksons' efforts to sell their residence, and their explanation for the delay between Barry's breach and the subsequent sale. After the breach, the Jacksons' residence was on the market through November 2002 at a price of $370,000. In November, they discovered a leak and took their

---

[9] The other cases the majority cites to support its conclusion that evidence of market conditions was required to show the resale was within a reasonable time do not concern a seller seeking to fix damages for a purchaser's breach by a resale price. *See Chan v. Montebello Dev. Co., L.P.*, No. 14-06-00936-CV, 2008 Tex. App. LEXIS 5980, at *11 (Tex. App.—Houston [14th Dist.] July 31, 2008, pet. denied) (mem. op.) (court, addressing validity of liquidated damages clauses in real estate contracts, recognizes that often "impossible to forecast the damages" to seller of real property in the event the purchaser breaches the contract); *Kollmeyer v. Stewart*, No. 05-00-01787-CV, 2001 Tex. App. LEXIS 8194, at *11 (Tex. App.—Dallas 2001, no pet.) (mem. op., not designated for publication) (seller seeking damages for purchaser's breach without a resale; subsequent offer after breach some evidence of market value at time of breach; no discussion of market conditions); *Barraza v. Koliba*, 933 S.W.2d 164, 169-70 (Tex. App.—San Antonio 1996, writ denied) (breaching party was seller; purchasers contended that paid for land that they thought included mineral rights when, in fact, the land did not; relevant time for determining market value of land without mineral rights was date of the purchase in June 1986 and not date of trial in October 1992); *Smith v. Herco, Inc.*, 900 S.W.2d 852, 861 (Tex. App.—Corpus Christi 1995, writ denied) (breaching party was seller; measure of damages was value of property with and without encroachment); *Corpus Christi Dev. Corp. v. Carlton*, 644 S.W.2d 521, 522 (Tex. App.—Corpus Christi 1982, no writ) (breaching party was seller; court does not address resale of property but the measure of damages for purchaser as the difference between contract price and market value at time of breach; evidence of market value at time of trial held no evidence of market value at time of breach).

17

residence off the market for repairs that were completed in the spring of 2003. Mr. Jackson testified that the "market was generally fairly slow up until late spring, early summer." They again placed their residence on the market in May 2003, listing it in July 2003 with a real estate agency, and ultimately entering into a contract to sell it in September 2003. Mohr, as the Jacksons' real estate agent, testified to his marketing efforts and the successful sale of the Jacksons' residence. He testified that he "listed [the residence] with the MLS, held some open houses, typical things that you would do to try to generate business. Internet ads, that sort of thing." He also testified to the market value of the Jacksons' residence, answering affirmatively when asked if the contract price of $339,000 was "in line with the comparables in the area at the time" and if the contract price was "a representation of what the fair market value would be." Mohr's expert testimony of market value was undisputed.

Improperly substituting itself as the fact finder, the majority disregards this evidence to reach its no-evidence finding.[10] *See City of Keller*, 168 S.W.3d at 810, 822; *Golden Eagle*, 116 S.W.3d at 761; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex. 1986). Based on this evidence, however, the district court could have concluded that the Jacksons sold their residence for a "fair" price within a "reasonable time" after Barry's breach, and that the delay and subsequent sale

---

[10] The majority's holding rewards purchasers who breach real estate contracts by presumably limiting damages in a slow or falling market: a seller, regardless of its efforts, would only be allowed to recover under the alternative measure of damages using a resale price if the real estate market remained constant. Otherwise, what is the significance of evidence of the actual market condition? Does the majority mean to transfer the risk of fluctuations in the real estate market to the non-breaching party? It would seem to be within common knowledge that, in a slow or falling market, such as the one here, it would take time to sell a residence.

18

price was reflective of the real estate market's condition during that time period.  *See Kempner*, 65 Tex. at 591.

The district court also could have found that the evidence of the subsequent sale's notice was sufficient to support the use of the subsequent sale price in determining actual damages. *See id.*  In contrast with the resale in *Kempner* that was made "privately" over one hundred years ago when real estate information was not so easily obtainable and disseminated, the Jacksons' subsequent sale was through a real estate agent that publicly listed and marketed their residence, including on the internet.  *Id.*  Further, even without finding that the subsequent sale price was binding on Barry, the district court could have concluded that (i) the circumstances surrounding the parties' negotiations and agreed sale price, (ii) the Jacksons' continuous efforts to market and sell their residence and the subsequent sale price, (iii) Barry's statement prior to his breach that the agreed sale price was "too expensive," and (iv) Mohr's testimony of market value were evidence of the residence's market value at the time of the breach.  *See City of Keller*, 168 S.W.3d at 810; *Kempner*, 65 Tex. at 591.  I would conclude that the evidence was legally and factually sufficient to support the district court's award of damages for the difference between the contract price and the subsequent sale price.  *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

The majority also reverses the award of $15,965 as a component of the actual damages.  But Barry does not dispute the district court's finding of fact that the Jacksons actually incurred additional costs of $15,965 in closing the subsequent sale that they would not have incurred under the residential contract.  I would conclude that additional costs incurred by the Jacksons as a

19

result of Barry's breach—economic losses that were actually sustained—are recoverable damages for breach of contract. *See Phillips*, 820 S.W.2d at 788; *Mood*, 245 S.W.3d at 12.

### 3.    *Additional Out-of-Pocket Damages*

Similar to his argument concerning the award of additional costs incurred in the subsequent sale, Barry does not dispute that the Jacksons incurred additional out-of-pocket expenses of $3,889 on the Pebble Garden contract but contends that the district court erred in awarding the additional damages because the measure of damages for breach of a real estate contract does not include "expenditures on unrelated property."

The district court made the following findings of fact concerning the Jacksons' additional out-of-pocket damages:

6)    After Defendant Barry entered into a contract to purchase the Plaintiffs Jacksons' property, the Jacksons entered into a contract to purchase property located at 6321 Pebble Garden, Austin, Texas.

7)    The Plaintiffs Jacksons, pursuant to the contract to purchase Pebble Garden, put down $3,500.00 in earnest money and option money.

8)    The Plaintiffs Jacksons also paid $389.00 in inspection fees on the Pebble Garden property.

* * *

10)    After Defendant Barry failed to purchase the Plaintiffs Jacksons' property, the Jacksons defaulted on their contract to purchase the property at 6321 Pebble Garden and lost the earnest money and option money.

20

These findings of fact support the district court's conclusion of law that "[t]he additional out-of-pocket damages incurred by the Plaintiffs Jacksons because of Defendant Barry's breach is $3,889.00."

Mr. Jackson testified that they discussed the Pebble Garden contract with Barry after Barry had received the inspection report on their residence and during the period that the Jacksons still had the option to terminate the Pebble Garden contract, but that Barry did not advise them that he was not going to close on their residence until after their option to terminate had expired on the Pebble Garden contract. That the Jacksons would lose their earnest money, option fee, and inspection fee as a result of Barry's breach of the residential contract was known to Barry when he decided not to complete the transaction and to purchase a different residence in the same neighborhood. On this record, the district court could have concluded that these additional damages were foreseeable to Barry and recoverable based on Barry's breach of the residential contract. *See Mood*, 245 S.W.3d at 12 (consequential damages may be recovered when "foreseeable and traceable to the wrongful act and result from it"); *see also Arthur Andersen*, 945 S.W.2d at 816 (direct and consequential damages defined and compared).

I therefore concur with the majority that the evidence was sufficient to support the district court's award of $3,889 of additional out-of-pocket damages. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

4.      *Attorney's Fees*

The contract between the parties provided that the "prevailing party in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding incurred by the prevailing party." The district court's findings of fact included that

21

the contract between the parties "provided for payment of attorney's fees to the prevailing party in any dispute," and its conclusions of law included that the "[r]easonable and necessary attorney's fees incurred by the Plaintiffs Jacksons total $23,165.00."

Barry contends that the evidence was insufficient to support the award of attorney's fees based on his position that the evidence was insufficient to support the award of any damages. Given that I would affirm the district court's award of damages for Barry's breach of the residential contract, I would conclude that the Jacksons are prevailing parties and contractually entitled to their attorney's fees. *See Intercontinental Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655-56 & n.27 (Tex. 2009) (prevailing party defined to include plaintiff who receives "affirmative judicial relief"). I would affirm the award of attorney's fees.[11] *See also* Tex. Civ. Prac. & Rem. Code Ann. § 38.001 (West 2008).

For these reasons, I would affirm the district court's judgment.

_____
Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Filed: March 19, 2010

---

[11] Barry alternatively sought remand to the district court for recalculation of attorney's fees if this Court reduced the damages awarded to the Jacksons. Based upon its reduction of damages, the majority remands the issue of attorney's fees to the district court for recalculation. I do not disagree that, in certain circumstances, appellate courts may remand the issue of attorney's fees when the appellate court modifies the amount of damages. *See Young v. Qualls*, 223 S.W.3d 312, 314-15 (Tex. 2007). Given that I would uphold the award of damages for Barry's breach of the residential contract, however, I would conclude that remand is not appropriate here.