

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-14-00097-CV

---

AZZ INCORPORATED AND AZZ
GROUP, L.P.

APPELLANTS

V.

MICHAEL COLEMAN MORGAN;
BOYCE GALVANIZING, LLC; AND
BIG SPRING HOLDINGS, LLC

APPELLEES

----------

FROM THE 67TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 067-257747-12

----------

## OPINION

----------

### I. INTRODUCTION

This is an appeal from a judgment on a jury's verdict in favor of Appellees Michael Coleman Morgan; Boyce Galvanizing, LLC; and Big Spring Holdings, LLC. The primary issues we address in this appeal are whether Appellants AZZ Incorporated and AZZ Group, L.P. (collectively, "AZZ") conclusively established

that AZZ suffered $454,000 in past lost-profit damages and, alternatively, whether the jury's findings that AZZ suffered zero past lost profits and zero future lost profits were against the great weight and preponderance of the evidence.[1] Because the evidence does not conclusively establish past lost profits and because the jury's zero past and future lost-profits damages findings are not against the great weight and preponderance of the evidence, we will affirm.

## II. FACTUAL AND PROCEDURAL OVERVIEW[2]

AZZ is in the business of galvanizing steel to prevent corrosion and to strengthen steel products; AZZ has thirty-five galvanizing plants. AZZ hired then twenty-three-year-old Cole Morgan in 2006 as an engineer. In connection with his employment with AZZ, Morgan signed a "Code of Ethics" and an "Employee Invention, Trade Secret, and Non-Compete Agreement."[3] In March 2010, AZZ promoted Morgan to the position of plant manager, and he moved to Peoria,

---

[1]AZZ does not expressly limit its factual sufficiency challenge to the jury's past lost-profits damages finding, so we liberally construe AZZ's issue as challenging both the factual sufficiency of the jury's zero past lost-profits damages finding and the jury's zero future lost-profits damages finding. *See* Tex. R. App. P. 38.1(f) (requiring appellate court to construe issues as covering every subsidiary question fairly included).

[2]We limit our recitation of the facts to those relevant to our disposition of this appeal; much testimony and evidence exists in the record concerning AZZ's misappropriation-of-trade-secrets and breach-of-fiduciary-duty theories of recovery that we need not set forth here.

[3]Although containing the phrase "Non-Compete Agreement" in its title, it is undisputed that this contract contains no postemployment noncompete provision; no contractual provision exists prohibiting Morgan from competing with AZZ after leaving AZZ's employment.

Illinois, to manage AZZ's plant there. In late summer 2010, AZZ promoted Morgan again, and he moved to Baton Rouge, Louisiana, to serve as the plant manager of an even larger AZZ plant located there.

In January 2011, while managing AZZ's plant in Baton Rouge, Morgan completed a twenty-eight-page business plan for a competing steel galvanizing business in Big Spring, Texas, that Morgan planned to name Boyce Galvanizing. Morgan set up a Boyce Galvanizing email address as well. Morgan's business plan referenced his knowledge of the steel galvanizing industry that was acquired while he was employed by AZZ. Morgan's plan listed several existing AZZ customers as included within the possible customer market for Boyce Galvanizing; one of them was Interstate Steel, a long-time customer of AZZ that had generated $691,000 in sales revenue for AZZ in 2012. Interstate Steel's plant is located in Big Spring, Texas.

In the spring of 2011, Morgan contacted the Big Spring Economic Development Corporation, banks, lenders, potential investors, and property owners to discuss purchasing property and building a steel galvanizing plant in Big Spring. Throughout the spring, summer, and early fall of 2011, while still managing AZZ's Baton Rouge plant, Morgan emailed, phoned, or met with Interstate Steel's CEO Kaddo Kothman dozens of times. The purpose of at least some of the contacts was to explore whether Interstate Steel might be interested in utilizing Morgan's company—Boyce Galvanizing—for its steel galvanizing needs if Morgan was successful in funding and building Boyce Galvanizing.

3

During one of these contacts, Morgan offered Kothman the opportunity to invest in Boyce Galvanizing.

Morgan did not tell AZZ of his plans for, or inquiries on behalf of, Boyce Galvanizing. On September 2, 2011, Morgan gave AZZ two weeks' notice of his upcoming September 16, 2011 resignation. Morgan traveled to Big Spring on September 22, 2011. In October 2011, in order to secure a bank loan, Morgan obtained written letters of intent from six known customers of AZZ—including Interstate Steel—setting forth the pounds of steel, on average, that Boyce Galvanizing would galvanize for the customer annually.

In December 2011, AZZ learned of Morgan's plans for Boyce Galvanizing and sent him a cease-and-desist letter. Morgan built a steel galvanizing plant in Big Spring and opened the doors of Boyce Galvanizing for business on February 18, 2013. Interstate Steel was Boyce Galvanizing's first customer; between February 2013, when Boyce Galvanizing opened and the time of trial in October 2013, Boyce Galvanizing generated $468,098 in revenue from Interstate Steel.

AZZ sued Morgan, Boyce Galvanizing, and Big Spring Holdings[4] for misappropriation of trade secrets, breach of fiduciary duty, and breach of contract. The case was tried to a jury; the jury failed to find that Morgan, Boyce Galvanizing, and Big Spring Holdings misappropriated AZZ's trade secrets and

---

[4]Morgan testified that after AZZ filed the present lawsuit, Boyce Galvanizing was divided into an asset holding company—Big Springs Holdings, and an operational company—Boyce Galvanizing.

4

failed to find that Morgan had breached his fiduciary duty to AZZ. The jury found for AZZ on its breach-of-contract claims against Morgan, finding that Morgan had failed to comply with both the "Code of Ethics" and the "Employee Invention, Trade Secret, and Non-Compete Agreement" that he had signed. The jury found, however, that AZZ had suffered zero past and future lost-profits damages, which were the only damages submitted. The trial court signed a take-nothing judgment against AZZ, and AZZ perfected this appeal.

### III. LOST PROFITS

In its first issue, AZZ asserts that it conclusively established that AZZ suffered past lost-profits damages in the amount of $454,000 from the loss of Interstate Steel's business. AZZ alternatively asserts in its first issue that the jury's awards of zero past and future lost-profits damages are against the great weight and preponderance of the evidence. Appellees contend that the jury properly awarded zero past and future lost-profits damages because (1) no causal nexus exists connecting Morgan's breach of the contracts he signed to AZZ's loss of Interstate Steel's business or to AZZ's loss of future profits, and (2) the jury was justified in disregarding the testimony of AZZ's damages expert because his opinions were unreliable and incompetent.

### A. The Law Concerning Lost Profits

To recover damages for breach of contract, a plaintiff must show that he suffered a pecuniary loss as a result of the breach. *Peterson Grp., Inc. v. PLTQ Lotus Grp., L.P.*, 417 S.W.3d 46, 64 (Tex. App.—Houston [1st Dist.] 2013, pet.

5

denied). "Such losses must be the natural, probable, and foreseeable consequence of the defendant's conduct." *Id.* (quoting *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 323–24 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)). A plaintiff may not recover breach-of-contract damages if those damages are remote, contingent, speculative, or conjectural. *Id.* Thus, the absence of a causal connection between the alleged breach and the damages sought will preclude recovery. *Id.*

Generally, the measure of damages for breach of a contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed. *Mood v. Kronos Prods., Inc.*, 245 S.W.3d 8, 12 (Tex. App.—Dallas 2007, pet. denied). This measure may include reasonably certain lost profits. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). Lost profits may be in the form of direct damages—that is, profits lost on the contract itself—or in the form of consequential damages—such as profits lost on other contracts resulting from the breach. *Mood*, 245 S.W.3d at 12. To be recoverable, consequential damages must be foreseeable and directly traceable to the wrongful act and result from it. *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998) (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997)). Thus, consequential damages are generally not recoverable unless the parties contemplated at the time they made the contract that such damages would be a probable result of the breach. *Stuart*, 964 S.W.2d at 921.

6

Proof of lost profits damages does not necessarily require proof that the loss is susceptible to exact calculation. *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex. 1994). Nor is the injured party required to produce in court the documents supporting the lost-profits opinions or estimates. *Heine*, 835 S.W.2d at 84. However, he must do more than merely show that he suffered some lost profits. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (citing *Heine*, 835 S.W.2d at 84); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 504 (Tex. 2001). The injured party must show the amount of the loss by competent evidence with reasonable certainty. *Swinnea*, 318 S.W.3d at 876. "What constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Heine*, 835 S.W.2d at 84. "At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits may be ascertained." *Szczepanik v. First S. Trust Co.*, 883 S.W.2d 648, 649 (Tex. 1994).

In other words, "reasonable certainty" is not demonstrated when the profits claimed to be lost are largely speculative or a mere hope for success, as from an activity dependent on uncertain or changing market conditions, on chancy business opportunities, or on promotion of untested products or entry into unknown or unproven enterprises. *Atlas Copco Tools, Inc. v. Air Power Tool & Hoist, Inc.*, 131 S.W.3d 203, 206–07 (Tex. App.—Fort Worth 2004, pet. denied). And uncertainty as to the exact amount of lost-profits damages will not defeat

7

recovery, but uncertainty as to the fact of legal damages is fatal to recovery. *Sw. Battery Corp. v. Owen*, 131 Tex. 423, 428, 115 S.W.2d 1097, 1099 (1938).

## B. Standard of Review

Appellants attacking the legal sufficiency of an adverse finding on an issue on which they had the burden of proof must demonstrate that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). The appellants must show that there is no evidence to support the factfinder's finding and that the evidence conclusively establishes the opposite of the finding. *See id.* We first examine the record for any evidence supporting the jury's finding while ignoring all evidence to the contrary. *Id.* If there is no evidence to support the finding, then we examine the entire record to determine whether the contrary proposition is established as a matter of law. *Id.*

To determine whether the evidence is factually sufficient to support a finding, an appellate court considers and weighs all evidence that was before the trial court. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). "When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Francis*, 46 S.W.3d at 242; *In re King's Estate*, 150 Tex. 662, 665, 244 S.W.2d 660, 661 (1951). As the reviewing court, we may not act as factfinder and may not pass judgment on the credibility of witnesses or substitute our judgment for that of the

8

trier of fact. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

## C. Analysis

## 1. The Jury's Findings

The jury found that Morgan had breached both of the contracts he signed with AZZ—the "Code of Ethics" and the "Employee Invention, Trade Secret, and Non-Compete Agreement." The "Employee Invention, Trade Secret, and Non-Compete Agreement" provided, in pertinent part:

> 8. Employee agrees that during the period Employee is employed by Employer, Employee shall not engage in any business or any other activity which is or may be contrary to the welfare, interests or benefit of Employer.

Morgan testified that he did not honor paragraph 8 of the "Employee Invention, Trade Secret, and Non-Compete Agreement" during his employment with AZZ. He testified:

> Q. Did you honor that provision during your employment with AZZ?
>
> A. . . . in the strictest sense of that provision of this agreement, I did not honor it. I was making a plan, but I also did not violate that. I did not go into competition while I was employed. I did not solicit employees. I did not solicit customers. I did not have any money to start anything. I do not believe I violated it. But in honor, no, I was in the wrong.

The "Code of Ethics" provided, in pertinent part:

**Conflicts of Interest**

You are expected to avoid all situations that might lead to a real or apparent conflict between your self-interest and your duties and

9

responsibilities to the Company. . . . Any position or interest, financial or otherwise, which could materially conflict with your performance as an officer, director or employer of the Company, or which affects or could reasonably be expected to affect your independence or judgment concerning transactions between the Company and its customers, suppliers or competitors or otherwise reflects negatively on the Company should be considered a conflict of interest.

. . . .

**Corporate Opportunities**

Using confidential information about the Company or its businesses, employees, agents, officers, directors, customers, or suppliers for personal benefit or disclosing such information to others outside your normal duties is prohibited.

Morgan testified that he believed he did honor the "Conflicts of Interest" provision, specifically with regard to Interstate Steel. He testified:

Q. Do you believe you honored that provision [the "Conflicts of Interest" provision] in respect to Interstate Steel?

A. I did not solicit them. I do not believe that anything I did, even opening up the plant, had any decision on Interstate switching because they had already switched to Sabre Galvanizing a year before I even came open.

So in your response to Interstate Steel specifically, no, sir. They switched well before I became a competitor on their own.

Concerning the "Corporate Opportunities" provision, Morgan admitted that he had violated that provision in July 2011 by providing detailed profit and loss information from AZZ's Peoria plant and Baton Rouge plant during the time he had managed those plants to a banker in Big Springs, Justin Myers, with whom Morgan was communicating about the possibility of a loan for Boyce Galvanizing.

10

He testified that this was AZZ's information and that he should not have disclosed it.

The damage question included in the court's charge was conditioned on an affirmative answer to any of the liability questions (misappropriation of trade secrets, breach of fiduciary duty, or breach of contract); it then asked, "What sum of money, if any, if paid now in cash would fairly and reasonably compensate AZZ for its damages, if any that were proximately caused by the wrongful conduct of [Appellees]." The question included the standard definition of proximate cause.[5] The jury answered zero for past and future lost profits.

## 2. Legal and Factual Sufficiency of Zero Past Lost-Profits Finding and Factual Sufficiency of Zero Future Lost-Profits Finding

### a. Evidence of No Nexus Between Morgan's Breach of the Contracts and AZZ's Loss of Interstate Steel's Business

The evidence established that AZZ did not have agreements with its customers to lock them into any particular term of doing business with AZZ. AZZ's Chief Operating Officer, Tim Pendley, testified that AZZ typically did not have contracts or agreements with top, long-time AZZ customers for ongoing

---

[5]The charge defined "proximate cause" as

> that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result there from. There may be more than one proximate cause of an event.

11

work with AZZ and specifically did not have such contracts with the six customers who signed letters of intent with Boyce Galvanizing. Instead, AZZ would send the customer a price list, the customer would issue a "PO" (purchase order) for a select number of items, and AZZ would bill them accordingly; only for "a very small, select few [customers] it will be by a project in which there is a contract written." The evidence established that AZZ's customers were free to stop sending business to AZZ at any time for any reason.

Morgan resigned from AZZ in September 2011, yet Interstate Steel continued to do business with AZZ for the next year. Bryan Stovall, Vice President of Central Operations for AZZ, testified that AZZ lost Interstate Steel as a customer in November 2012 when Interstate Steel began utilizing Sabre Galvanizing in Alvarado. Interstate Steel sent no business to AZZ in 2013. AZZ's valuation expert, David Fuller, testified that AZZ last invoiced Interstate Steel in November 2012 and that AZZ generated $1.4 million in revenue from Interstate Steel for the year ending February 29, 2013.[6] On February 18, 2013, the date that Boyce Galvanizing opened its doors for business, Interstate Steel began sending its galvanizing business to Boyce Galvanizing.

The record contains no explanation for why Interstate Steel elected to discontinue its long-standing business relationship with AZZ and switch to Sabre Galvanizing and then to Boyce Galvanizing, but the evidence in the record does

[6]This is the date used in the record, despite that 2013 was not a leap year.

12

establish that Interstate Steel was free to do so because AZZ did not have a contract with Interstate Steel binding Interstate Steel to a fixed-term business relationship with AZZ. *Cf. Heritage Operating, L.P. v. Rhine Bros.*, No. 02-10-00474-CV, 2012 WL 2344864, at *7 (Tex. App.—Fort Worth June 12, 2012, no pet.) (mem. op.) (considering testimony of former customers that business formed in violation of post-employment covenant-not-to-compete had solicited customers' business). Although AZZ asserted and offered some evidence that Morgan had solicited Interstate Steel's business on behalf of Boyce Galvanizing during his employment with AZZ, Morgan repeatedly denied doing so and said he could not solicit Interstate Steel's business while he was employed with AZZ because he did not have a galvanizing plant then. The contracts Morgan signed do not contain any post-employment covenant-not-to-compete clauses, and Morgan freely admitted that "since the day [Boyce Galvanizing] was in operation," he has been soliciting the business of each of the companies that provided Boyce Galvanizing with letters of intent; the companies have just not been sending him the business they projected.

### b. Evidence of Faulty Assumptions by Fuller

AZZ's valuation expert David Fuller testified that AZZ had suffered $454,000 in past lost profits from the loss of Interstate Steel's business and would suffer $3,206,000 in future lost profits from the loss of Interstate Steel and

five other companies as customers.[7]  In computing AZZ's lost profits, Fuller assumed that each of the six AZZ customers[8] who had signed letters of intent for Morgan would move all of their business to Boyce Galvanizing.  He looked at the volume of sales that AZZ had been generating for each of these customers and looked at the profitability associated with each of the specific AZZ galvanizing plants that these customers had purchased from.  Once he knew how much each customer was buying and knew AZZ's profit margin in each of the plants where the work was performed for these customers, he was able to calculate the amount of annual profit that AZZ had generated from each customer.  Because AZZ had lost Interstate Steel's business prior to trial, Fuller utilized this formula to compute the profits that AZZ had lost in the past—from November 2012 through trial in October 2013—by virtue of losing Interstate Steel's business and arrived at the figure of $454,000.  Fuller did not calculate past lost profits for the five other customers that had signed letters of intent with Boyce Galvanizing because "based on the last sale date, AZZ had not yet lost those client relationships for the other customers."

---

[7]Fuller's report was not introduced into evidence, and at trial, he explained his computations using a sketch pad near the witness stand; the sketch pad computations are not included in the record.  Therefore, we summarize Fuller's testimony as best we are able without the benefit of the documents showing the columns and calculations referred to in his testimony.

[8]Those customers were ALNC, Hirschfeld Industries, Interstate Steel, Interstate Treating, Saulsbury Industries, and Young's Building Systems.

To determine future lost profits, Fuller then performed a customer-attrition analysis for AZZ and determined that AZZ kept customers with yearly sales of over $100,000 for over ten years. Fuller determined the likely remaining duration of each of the six customers' business relationships with AZZ based on his customer-attrition analysis and, utilizing the annual-profit figure he had calculated for each customer, generated future lost-profit calculations based on a three-year and a five-year remaining life span of the relationship. He then reduced the numbers to present value; the combined calculated future lost profits from all six customers totaled $3,206,000.

Morgan testified that one of the assumptions Fuller utilized to arrive at his calculation of AZZ's future lost profits—the assumption that all of the companies who were customers of AZZ and had signed a letter of intent with Morgan would move all of their business to Boyce Galvanizing—was false. Morgan testified that this was a false assumption because "of all those companies that signed letters of intent, I would say Interstate Steel is the only one [Boyce Galvanizing is] remotely getting a portion of the work from." Morgan testified that several of the companies that signed letters of intent with Boyce Galvanizing were still using AZZ for at least some of their galvanizing needs; he testified that a driver for Saulsbury showed up at Boyce Galvanizing to pick up some items, and Morgan saw "a strapping from AZZ Galvanizing in Crowley and it has their phone number on it." Morgan snapped a picture of the load, and it was introduced into evidence.

15

### c. Application of Standards of Review to Evidence

Applying the first step of the conclusively-established-as-a-matter-of-law legal-sufficiency analysis and examining the record for any evidence supporting the jury's finding of zero past lost-profit damages while ignoring all evidence to the contrary, we hold that some evidence exists from which the jury, as the sole judge of the credibility of the witnesses, could have determined that AZZ had suffered no pecuniary loss as the probable and foreseeable result of Morgan's breaches of the "Code of Ethics" and of the "Employee Invention, Trade Secret, and Non-Compete Agreement." *See, e.g.*, *Stuart*, 964 S.W.2d at 921 (requiring lost-profits damages from breach of contract to be directly traceable to the wrongful conduct and to result from it); *see also Francis*, 46 S.W.3d at 241 (setting forth standard of review). Fuller offered no causation opinion, and the jury was free to believe that Morgan's breaches of the "Code of Ethics" and of the "Employee Invention, Trade Secret, and Non-Compete Agreement" during his employment with AZZ did not proximately cause Interstate Steel to stop doing business with AZZ over a year after Morgan's employment with AZZ had ended. *See S. Elec. Servs., Inc.*, 355 S.W.3d at 323–24. The jury was free to believe that Morgan's postemployment solicitation of Interstate Steel's business caused Interstate Steel to stop doing business with AZZ or that Interstate Steel decided to stop doing business for some reason known only to Interstate Steel. Applying this same line of reasoning, we also hold that some evidence exists from which the jury could have determined that Fuller's past-lost-profits analysis was

16

speculative because it was based on the assumption that Interstate Steel would continue sending its galvanizing work to AZZ from November 2012 through October 2013, despite the lack of a formal business arrangement between Interstate Steel and AZZ and despite the fact that Interstate Steel had in fact exercised its right to stop using AZZ in November 2012. *See, e.g.*, *Mood*, 245 S.W.3d at 13 (holding expert's lost-profits analysis based on assumption of continuation of distributorship agreement constituted no evidence of direct or consequential damages for breach of sixty-day notice-of-termination provision in agreement); *Atlas Copco Tools, Inc.*, 131 S.W.3d at 206–07 (holding expert's lost-profits projections were speculative because they assumed a contract renewable yearly would be renewed for six consecutive years despite letter terminating contract); *United Way of San Antonio, Inc. v. Helping Hands Lifeline Found., Inc.*, 949 S.W.2d 707, 711–12 (Tex. App.—San Antonio 1997, writ denied) ("[T]he mere hope for funding renewable at the discretion of another party will not support recovery of any future funds the other party could withhold at its discretion."). Because under the first step of the conclusively-established-as-a-matter-of-law legal-sufficiency analysis some evidence exists supporting the jury's award of zero past lost-profits damages, AZZ has failed to conclusively establish $454,000 in past lost-profits damages, and we overrule that portion of AZZ's first issue claiming otherwise.[9]

---

[9]Because we hold that AZZ did not conclusively establish $454,000 in past lost-profits damages, we likewise hold that AZZ is not entitled to a remand to

We next address AZZ's complaint that the jury's zero past lost-profits damages and zero future lost-profits damages findings are against the great weight and preponderance of the evidence. We must consider and weigh all of the evidence and set aside the jury's finding only if the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Francis*, 46 S.W.3d at 242. Citing this court's opinion in *Heritage Operating, L.P.*, AZZ argues that "[w]hen there is objective evidence of injury, a jury's award of zero damages is against the great weight and preponderance of the evidence." 2012 WL 2344864, at *7. *Heritage* involved a defendant's breach of a postemployment covenant-not-to-compete by starting a competing company; Heritage's former customers testified that the competing company had solicited their business, and Heritage produced eighteen contracts signed by its former customers with the new competing company. *Id.* In *Heritage*, we reviewed this evidence of an injury—testimony that the competing company had solicited Heritage's clients and the contracts signed by Heritage clients with the competing company—and based on this uncontroverted, objective evidence of an injury, we held that the jury's zero damages award was against the great weight and preponderance of the evidence because the record contained some evidence of damages. *Id.* at *8.

recover attorney's fees on its breach of contract claims. *See Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 40–41 (Tex. 2012) (requiring recoverable damages on breach of contract claim in order to recover attorney's fees).

18

Here, unlike in *Heritage*, the evidence concerning the existence of an injury was hotly contested.

This contested evidence concerning whether AZZ suffered an injury from Morgan's breach of the "Code of Ethics" during his employment with AZZ and his breach of the "Employee Invention, Trade Secret, and Non-Compete Agreement" during his employment with AZZ includes the following. Interstate Steel continued to do business with AZZ for over a year after Morgan resigned from AZZ. When Interstate Steel stopped doing business with AZZ in November 2012, it began utilizing Sabre Galvanizing. No reason is given in the record for Interstate Steel's decision to end its long-time relationship with AZZ and to begin using Sabre Galvanizing. AZZ established that there were numerous communications between Morgan and Kothman while Morgan was employed with AZZ; some of the communications suggested that Morgan had solicited Interstate Steel's business on behalf of Boyce Galvanizing while he was employed with AZZ. Morgan repeatedly denied soliciting Interstate Steel's business while employed with AZZ and denied competing with AZZ while he was employed with AZZ. Morgan said he could not solicit Interstate Steel's business while he was employed with AZZ because he did not have a galvanizing plant then. Morgan denied that he had solicited Interstate Steel's business by striking a deal that when he opened Boyce Galvanizing, Interstate Steel would come do business with him. Thus, here, there is evidence from which the jury could have concluded that AZZ suffered no objective past lost-profits injury other than loss of

19

a mere hope that Interstate Steel would continue to send some or all of its galvanizing business to AZZ despite the lack of a contractual relationship between Interstate Steel and AZZ.[10] *See Atlas Copco Tools, Inc.*, 131 S.W.3d at 206–07; *accord Acadia Healthcare Co. v. Horizon Health Corp.*, No. 02-13-00339-CV, 2015 WL 831474, at *8 (Tex. App.—Fort Worth Feb. 26, 2015, no pet. h.) (mem. op.) (holding expert's lost-profits calculations speculative when based on assumption that, but for defendant's wrongful conduct, at-will employee would have remained employed with plaintiff for fifteen years after employee actually resigned and would have continued same level of sales during that time); *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied) (holding plaintiff—who declined at-will brokerage position based on defendant's negligent misrepresentation that defendant would help plaintiff start a business—could not recover past lost-salary damages from declined brokerage position because "[d]amages for anticipated lost salary are inappropriate where employment is at will" and "[t]here is no certainty how long [plaintiff] would have worked as a broker"). Thus, here, uncertainty exists as to

---

[10]In its reply brief, AZZ argues that it was required to prove only lost sales caused by Morgan, not an exclusive customer relationship with Interstate Steel. We agree. But the absence of an agreement between AZZ and Interstate Steel to do business for a set period of time and the absence of an explanation in the record for Interstate Steel's decision to terminate its relationship with AZZ permitted the jury to reasonably infer that Interstate Steel's termination of its relationship with AZZ was not directly attributable to Morgan's breaches of the "Code of Ethics" and of the "Employee Invention, Trade Secret, and Non-Compete Agreement" while employed by AZZ.

20

the fact of an injury (the loss of Interstate Steel's business) from the breaches—which is fatal to recovery, while in *Heritage*, uncertainty existed only as to exact amount of lost profits damages—which will not defeat recovery. *See Sw. Battery Corp.*, 131 Tex. at 428, 115 S.W.2d at 1099. Giving due deference to the jury's credibility determinations, as we must, we hold that the jury's finding that AZZ suffered zero past lost-profits damages is not against the great weight and preponderance of the evidence. We overrule this portion of AZZ's first issue.

Lastly, we address AZZ's challenge to the factual sufficiency of the evidence to support the jury's award of zero future lost-profits damages. As set forth above, in computing future lost-profits damages, Fuller calculated AZZ's lost profits three years and five years into the future.[11] Fuller testified that his calculations assumed that AZZ had lost or would lose all of the business of the six customers who had signed letters of intent with Boyce Galvanizing, that these customers would have continued to do the same amount of business with AZZ annually for the three-year or five-year future lost-profits term, and that the AZZ plants utilized by these customers would have maintained the same level of profitability over the three-year or five-year future lost-profits term. Fuller agreed that at the time of trial, AZZ continued to provide some galvanizing services for

---

[11]Apparently on the sketch pad Fuller utilized while testifying, he also computed AZZ's future lost-profits totals for one, two, and three years following trial. Because we conclude below that the assumptions upon which Fuller based his calculations are speculative, any discrepancy in the term for which he calculated future lost-profit damages is immaterial.

21

ALNC and for Saulsbury, two of the six businesses that signed letters of intent with Morgan. Fuller also agreed that the future lost profits actually suffered by AZZ could be higher or lower than his computations; he provided an estimate. And finally, Fuller agreed that under his future lost-profits analysis, Boyce Galvanizing could be required to pay AZZ damages for future lost profits even if the customer AZZ lost did not utilize Boyce Galvanizing's services. Although the methodology utilized by Fuller—after making the above assumptions—to calculate AZZ's future lost profits for three years or five years into the future may be valid, the underlying assumptions themselves, that is, the facts Fuller's future lost-profits calculations are premised on, are merely speculative. *See, e.g.*, *Aquila Sw. Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225, 246 (Tex. App.—San Antonio 2001, pet. denied) (holding expert testimony using proper methodology nonetheless constituted no evidence of lost profits when underlying factual basis for computation was merely speculative). Accordingly, we hold that the jury's finding of zero future lost-profits damages is not against the great weight and preponderance of the evidence. We overrule the remainder of AZZ's first issue.

### D. Effect of Jury's Award of No Damages

Appellees argue that if this court overrules AZZ's legal and factual sufficiency challenges to the jury's zero past-lost-profits-damages findings, then we need not address AZZ's second issue alleging charge error in the breach-of-fiduciary-duty question or AZZ's third issue challenging the legal and factual

22

sufficiency of the evidence to support the jury's "no" answer to the breach-of-fiduciary-duty question. AZZ, on the other hand, asserts that because the damages question was conditionally submitted and because the jury answered "no" to the breach-of-fiduciary-duty question, the jury's zero damages finding applies only to its breach-of-contract theory of recovery; AZZ claims that if charge error exists in the breach-of-fiduciary-duty question, then AZZ is entitled to a remand to have the jury consider a properly submitted breach-of-fiduciary-duty question and to make a damages finding based on that proper question.

It is true, as AZZ contends, that a party is entitled to sue and to seek damages on alternative theories, and a judgment awarding damages on each alternative theory may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damage findings are made as to each theory. *See Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998); *see also Peterson Grp., Inc.*, 417 S.W.3d at 64 (upholding separate recoveries for fraud and breach of contract claims because claims "sought recovery of different damages" and because the jury awarded "separate and distinct damages for separate and distinct injuries for fraud and breach of contract"). But for one injury, there can be only one recovery. *Utts v. Short*, 81 S.W.3d 822, 831 (Tex. 2002); *Foley v. Parlier*, 68 S.W.3d 870, 882–83 (Tex. App.—Fort Worth 2002, no pet.). A party is entitled to but one satisfaction for the injuries sustained by him. *See, e.g., Tony Gullo Motors, I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006); *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1,

23

7 (Tex. 1991). Thus, when a defendant's acts result in a single injury and the jury returns favorable findings on more than one theory of liability, the plaintiff is entitled to judgment on the theory affording him the greatest relief. *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988); *see also Saden v. Smith*, 415 S.W.3d 450, 466 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding plaintiff entitled to one award of lost profits although jury awarded lost-profits damages in connection with breach-of-contract question and breach-of-fiduciary-duty question).

Here, AZZ sought recovery of the same damages—lost profits—for each of its theories of liability. AZZ did not seek recovery of different damages for a distinct injury stemming from each of its liability theories. *Cf. Peterson Grp., Inc.*, 417 S.W.3d at 64 (upholding award of fraud and breach-of-contract damages when damage awards were for separate, distinct injuries). AZZ did not allege different damages were attributable to Morgan's alleged disloyal acts purportedly constituting a breach of his fiduciary duty to AZZ than the damages attributable to Morgan's breach of the "Code of Ethics" and his breach of the "Employee Invention, Trade Secret, and Non-Compete Agreement." The single injury for which AZZ sought recovery was lost profits.

The causation evidence discussed above in connection with AZZ's legal and factual sufficiency challenges to the jury's zero past lost-profits damages award may be unique to AZZ's breach-of-contract claim. This same causation analysis would not necessarily apply to a jury's determination of damages based

24

on an affirmative answer to the breach-of-fiduciary-duty question. But the faulty assumptions that Fuller premised his past and future lost-profits damages model upon render his lost-profits conclusions speculative, and this defect would persist even if a breach-of-fiduciary-duty question had been submitted, as AZZ contends it should have been, and even if the jury had answered the breach-of-fiduciary-duty question affirmatively. Consequently, our holdings—that the jury's zero past lost-profits damages finding is supported by legally sufficient evidence and that the jury's zero past and future lost-profits damages findings are supported by factually sufficient evidence—do, under the particular facts here, make it unnecessary for us to address AZZ's second and third issues. *See Hancock v. City of San Antonio*, 800 S.W.2d 881, 885–86 (Tex. App.—San Antonio 1990, writ denied) (holding charge error harmless because plaintiff was entitled to no recovery based on percentage of fault assigned to party who settled before trial); *Canales v. Nat'l Union Fire Ins. Co.*, 763 S.W.2d 20, 22 (Tex. App.—Corpus Christi 1988, writ denied) (explaining alleged charge error need not be addressed when plaintiff not entitled to damages based on zero damages award).

AZZ also argues that we should reach its second issue claiming charge error in the breach-of-fiduciary-duty question because in connection with that claim, AZZ pleaded for the equitable remedy of disgorgement. AZZ argues that, despite the jury's zero damages award, the trial court may grant this remedy if on remand, after a proper submission, a jury finds a breach of fiduciary duty. Under the equitable remedy of disgorgement, a person who renders service to another

25

in a relationship of trust may be denied compensation for his service if he breaches that trust. *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999). The remedy essentially returns to the principal the value of what it paid for because it did not receive the trust or loyalty. *Id.* at 237–38; *McCullough v. Scarbrough, Medlin & Assoc., Inc.*, 435 SW.3d 871, 904 (Tex. App.—Dallas 2014, pet. denied). To obtain the remedy of equitable disgorgement, however, proof of the fiduciary's salary, profits, or other income during the time of his breach of fiduciary duty is required, as well as proof of what he was actually entitled to receive. *See McCullough*, 435 S.W.3d at 904 (trial court signed final judgment for "equitable forfeiture and disgorgement remedy" based on difference between jury's findings as to amount fiduciary received and amount he was entitled to receive). AZZ does not point to evidence of monies wrongfully gained by Morgan during his employment with AZZ that should be disgorged, nor have we located such evidence in the record. Consequently, we hold that AZZ's pleading for disgorgement, in the absence of evidence of monies subject to disgorgement, does not require a remand.

## IV. CONCLUSION

Having overruled AZZ's first issue, we need not address Appellees' conditional cross-point challenging the sufficiency of the evidence to support the jury's affirmative breach-of-contract findings. Having determined that we need not address AZZ's second and third issues, we affirm the judgment of the trial court.

26

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and WALKER, JJ.

DELIVERED: April 9, 2015